## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

King & King, Chartered,           )

                               )

                            )

                **Plaintiff**     )

       **v.**                    )     **Case No.   06-cv-00324 (JDB)**

                            )

**Harbert International, Inc.** *et al*,     )

                            )

             **Defendants**    )

_____)

### FIRST AMENDED COMPLAINT

#### Parties

1.      Plaintiff, King & King, Chartered  is a law firm founded in the District of Columbia in 1866 and organized and existing as a professional corporation under D.C. Code §29-401 since October 9, 1973.   At all times pertinent to this action its office was located in the District of Columbia.

2.      Defendant, Harbert International, Inc., hereinafter referred to as "HII," is a Delaware corporation domiciled in Birmingham, Alabama.  HII was formed in 1981 as a subsidiary of Harbert Construction Company, hereinafter referred to as "HCC".  HCC was founded in 1949 by John M. Harbert, who controlled that company and HII through his ownership of more than 75% of the capital stock of HCC.  Bill L. Harbert, hereinafter referred to as "Bill Harbert," John's brother, owned various interests in HCC at various times, but such interest never exceeded 6% of the capital stock.  The two brothers concentrated their efforts on developing HCC's construction business in both the domestic and international markets.  By 1975 it was decided that the international business, in which defendant, Bill Harbert was primarily engaged had developed to

an extent that warranted his receiving a greater share of the company profits than that represented by his minority interest in HCC.   Defendant, Harbert International Establishment, hereinafter referred to as "HIE" was formed.  Defendant, Bill Harbert initially owned 42% of HIE and HCC owned the other 58%.  In 1977, a company named Harbert Corporation was formed as a holding company to hold the Harberts' various business interests including HIE.  After HII was formed in 1981 the construction interests of HCC, including its ownership of HIE, were transferred to HII. In 1989, the ownership interest of defendant, Bill Harbert, in HIE was increased to 50%, with defendant, HII retaining ownership of the remaining 50%.  Defendant, Bill L. Harbert was the President of HII from its inception until July 1990.  In July 1990, Raymond J. Harbert succeeded his father, John Harbert, as CEO of HII and was also appointed its President, replacing his uncle, Bill Harbert who at that time became Vice Chairman of HII's Board of Directors.

3.      Defendant, Bilhar International Establishment is an entity organized and existing under the laws of the Principality of Liechtenstein, and is the successor in interest to HIE, which was organized under the laws of Liechtenstein in 1975. Initially, the company was named Harbert International Establishment ("HIE").  Its name was changed to Bilhar International Establishment in 1993.  These entities are hereinafter commonly referred to as HIE.

4.      Defendant, Bill Harbert International Construction, Inc., hereinafter referred to as "BHIC" is a Delaware corporation domiciled in Birmingham, Alabama.

5.      Defendant, Raymond J. Harbert, is a citizen of the United States, and resides in or near Birmingham, Alabama.  He is the President and CEO of Harbert Corporation or its successor and the Chairman and CEO of Harbert International, Inc., as well as its former President.

6.      Defendant, Bill L. Harbert, is a citizen of the United States, and resides in or near

2

Birmingham, Alabama.  He is the former President and CEO of Bill Harbert International Construction, Inc. and is, or was formerly, the Managing Director of HIE, and as previously stated above was the President of HII until July 1990, and Vice Chairman of its Board of Directors until 1992.  All of the corporate entity defendants are privately held, owned and controlled by the individual defendants and/or other Harbert family members.

### Jurisdiction and Venue

7.    This action was initially filed in the Superior Court of the District of Columbia pursuant to D.C. Code §§11-921 and 13 – 423 and subsequently removed to the Court pursuant to 28 U.S.C. §1441 by the defendants.

### History of Parties' Relationship

8.    Plaintiff first encountered the Harbert brothers in 1979 in Israel where a Harbert controlled company was participating in a construction joint venture known as Negev Airbase Constructors, which had been awarded a contract by the U.S. Army Corps of Engineers to design and build an airbase for the Israeli Ministry of Defense under the terms of the Camp David Peace Accords.

9.    Thereafter on a regular and continuing basis, throughout the 1980's and into the 1990's, plaintiff provided legal services with respect to various construction contracts awarded to HII by agencies of the United States Government, or funded by such agencies; including, but not limited to, the Rod el Farag Water Treatment Plant in Cairo, Egypt; funded by the United States through the U.S. Agency for International Development; construction of new U.S. Embassies in

Bahrain and Pretoria, South Africa; renovation of the U.S. Embassy in Belgrade; a waste water treatment plant in Puerto Rico. Plaintiff provided similar legal services to HII in connection with a coal loading facility contract in Punta Arenas, Chile. Typically, plaintiff's involvement in such projects began with a telephone call from an individual representing defendant, HII, to plaintiff's office in Washington, D.C., requesting plaintiff's assistance in connection with a problem or problems that had arisen on a pending international construction project. The individual attorneys assigned by plaintiff to work on such matters were physically located in the offices of the firm in the District of Columbia; although such attorneys did visit the specific project sites in the performance of such legal services. At all times subsequent to the creation of HII in 1981, plaintiff reasonably believed that it had been engaged by and was providing legal services to defendant, HII, in respect to each of these international construction projects. None of the defendants, nor any other entity or individual ever did or said anything to plaintiff to counter plaintiff's belief in this regard until the spring of 2002.

### The Rod el Farag and Kwajalein Contracts

10.    The Rod el Farag and Kwajalein contracts are representative of the process under which plaintiff was typically engaged to provide legal services in connection with international construction contracts awarded to defendant, HII.

11.    The contract for construction of the Rod el Farag Water Treatment Plant was awarded to a joint venture consortium, comprised of HII and two other United States construction companies in June 1982 by the General Organization for the Greater Cairo Water Supply, an agency of the Arab Republic of Egypt. The project was financed by the United States Government through the

Agency for International Development.  Disputes arose between the construction contractors and the Egyptian water supply agency in regard to numerous changes, unforeseen subsurface conditions, suspensions, delays and interruptions to the work for which the Egyptian water supply agency was responsible.

12.    In 1985, prior to completion of work under the contract, plaintiff received a telephone call from Mr. E. Roy Anderson, who plaintiff understood to be an officer of defendant, HII, and who was located in London, England.  Mr. Anderson requested that plaintiff send an attorney to Cairo, Egypt to investigate the facts underlying the problems encountered in the performance of the Rod el Farag contract, and to meet with him in London to advise as to the potential viability of a claim or claims for additional costs incurred by the consortium in performance of the work. It was plaintiff's understanding that defendant, HII, was the managing partner of the consortium and that it held the majority financial interest in the same.  Pursuant to Mr. Anderson's request, plaintiff sent one of its attorneys to Cairo, who met with representatives of defendant, HII, at the project site for several days; following which he met with Mr. Anderson in London to report the results of his investigations and to outline what needed to be done to develop a claim to be presented to the Egyptian water supply agency for payment.  Plaintiff, thereafter, undertook the preparation of such claim; directing representatives of defendant, HII, and others in the development of the facts to support a claim by the consortium.  A statement of such claim for additional compensation, as prepared by plaintiff, was submitted to the Egyptian water supply agency by the consortium under date of December 11, 1986, and, following extended but fruitless negotiations, the consortium advised the Egyptian water supply agency that it would pursue its rights to have its claim submitted to arbitration before the International Chamber of Commerce in

5

Paris, France, as provided under the Rod el Farag contract. The claim as submitted for arbitration totaled US $12, 859,545.24 and Egyptian pounds 5,497,728.88. Plaintiff represented the consortium in the arbitration in Paris, and, following its successful opposition to an effort by the Egyptian party to dismiss the case for lack of jurisdiction, the parties settled the matter in late 1988 or early 1989 under the terms of which settlement, defendant, HII, and its consortium partners received an additional payment of approximately $7,000,000 under the contract.

13.    Plaintiff's involvement with the Kwajalein contracts followed a similar pattern. In 1987, defendant, HII was awarded Contract No. DACA 83-87-C-0100 by the United States Government, acting through the Army Corps of Engineers, for work to be performed at Kwajalein Atoll, Marshall Islands in support of the Strategic Defense Initiative, more commonly known as the Star Wars anti-ballistic missile defense system. This was the first of fifteen contracts, hereinafter, the "Kwajalein contracts", ultimately awarded to defendant, HII, by the Government for work at Kwajalein Atoll between the years 1987 and 1989. As with the Rod el Farag project many disputes arose between the Government and defendant, HII, with respect to contract performance. In July, 1990, defendant, Bill Harbert, then president of HII authorized the engagement of plaintiff to provide legal advice and assistance with respect to the Kwajalein contracts, and more particularly to help HII in the preparation and presentation of claims for additional compensation for added costs incurred in contract performance. Pursuant to such authorization, Mr. E. Roy Anderson called plaintiff's office in Washington, D.C. in July 1990, and requested that plaintiff provide defendant, HII, with such legal assistance, and more specifically, requested that one of plaintiff's attorneys meet with Mr. Anderson and other HII representatives in Honolulu, Hawaii and at the project site in Kwajalein as soon as possible.

6

With its engagement by defendant, HII, in July 1990, plaintiff was actually involved on essentially a continuous basis, in providing legal advice and assistance to HII in respect to numerous claims and issues related to and arising out of the performance of the Kwajalein contracts from that time until December 2002.

14.    Construction work under the Kwajalein contracts was finally completed in the fall of 1991; following the termination of Contract No. DACA 83-90-C-0006 by the United States for its convenience on July 8, 1991.  Prior to completion of the contract work, numerous claims for various changes to the work had been submitted in the name of defendant, HII, at the job site level.  All of such claims had been submitted pursuant to the provisions of the Contract Disputes Act of 1978, 41 U.S.C. §601, *et seq.*, hereinafter referred to as the "CDA," and included a demand for payment of interest on any amounts found due on said claims as provided under the CDA, 41 U.S.C. §611.  Agreement on the principal amounts due on such claims was generally reached by the parties, but the Government's representatives steadfastly refused to make payment of any interest on the said amounts, as provided by the CDA.  Accordingly, appeals were noted in the name of defendant, HII, from such refusal by the Government's contracting agency to make payment of such interest, and docketed before the Armed Services Board of Contract Appeals, hereinafter, "ASBCA" or the "Board," as also provided under the provisions of the Kwajalein contracts and the CDA.  These "interest claims" totaled approximately $93,458.23 in value.

15.    In terms of additional costs incurred in performance of the Kwajalein contracts, the major factors contributing to or causing the same were delay and disruption to the progress of the work under the various contracts resulting from design changes, extra work, differing subsurface site conditions, and work suspensions for which the Government was contractually and legally

7

responsible.  However, by early 1992, it was readily apparent that these issues were not fully

addressed in the separate claims for changes being prepared by the job-site office; particularly as

related to the overall or global impact of such delaying factors on U.S. management, engineering

and administrative personnel costs and expenses, equipment expenses, and direct labor costs.

Accordingly, plaintiff recommended that such global impact issues be addressed in a separate,

comprehensive claim that would take into account any and all delaying events that had affected

performance of the work under all 15 of the Kwajalein contracts and for which defendant, HII,

believed the Government was contractually and legally responsible.

16.    Throughout 1992 and 1993, plaintiff's attorneys devoted thousands of hours of work to

the development of the facts relating to the performances of each of the 15 Kwajalein contracts

and the Government caused delays to such work, which efforts included direction and guidance

to individuals at Kwajalein, whom plaintiff understood to be employees or representatives of

defendant, HII, but who may have in fact been employees or representatives of defendants, Bill

Harbert, BHIC and/or BIE, in the analysis of labor hours worked on each separate contract, and

the uncompensated direct labor costs incurred; and in the identification and evaluation of

uncompensated administrative personnel costs and other overhead expenses and equipment costs

experienced in performance of the Kwajalein contracts.  Such efforts by plaintiff's attorneys

culminated in a formal written claim, dated January 28, 1994, submitted by defendant, HII, to the

Government's Contracting Officer at the U.S. Army Engineer District Office in Honolulu,

Hawaii.  The claim sought an adjustment in contract price for the Kwajalein work in the amount

of $12,856,605, plus interest thereon and demanded a decision by the Contracting Officer on the

same, both in accordance with the CDA.  The claim of January 28, 1994 was signed by

8

defendant, Raymond J. Harbert, as President of Harbert International, Inc., and as required by the

provisions of the CDA, included the following certification, also signed by defendant, Raymond

J. Harbert, as President of Harbert International, Inc.:

> I hereby certify that the claim of Harbert International, Inc. for an equitable
> adjustment in the amount of $12,856,605 under Contract Nos.:
>
> > DACA83-87-C-0100, DACA83-88-C-0010, DACA83-89-C-0023,
> > DACA83-89-C-0045, DACA83-90-C-0001, DACA83-90-C-0006,
> > DACA83–89-M-0263, DACA83-89-M-0272, DACA83–89-M-
> > 0285, DACA83-89-C-0097, DACA83-89-C-0098, DACA83-89-
> > M-0100, DACA83-89-C-0096, DACA83-90-M--0314, DACA83-
> > 90-M-0101
>
> submitted to the Contracting Officer by letter dated  January 28, 1994 , is made in
> good faith; that the supporting data are accurate and complete to the best of the
> Contractor's knowledge and belief, and that the amount requested accurately
> reflects the contract adjustment for which the Contractor believes the Government
> is liable.
>
> >   (Original signed by defendant, Raymond J. Harbert)
> > Raymond J. Harbert
> > President
> > Harbert International, Inc.

The claim as submitted and certified by defendants, Raymond J. Harbert and HII, was received

by the Government's Contracting Officer in Honolulu on February 4, 1994, and interest on the

$12,856,605 claimed began to accrue on that date.

17.    Progress toward resolution of the various claims and appeals arising out of the Kwajalein

contracts was continuously impeded by repeated efforts on the part of Government counsel in

Honolulu to have the appeals before the ASBCA dismissed for lack of jurisdiction under various

legal theories, and, in respect to the claim of January 28, 1994 referred to in Par. 16 above, to

withhold a final decision on the same on the baseless contention that the Government's

9

Contracting Officer had no authority to render such a decision. These contentions of the Government's trial counsel in Honolulu resulted in numerous motions, responses and replies by defendant, HII, prepared and filed by plaintiff with the ASBCA beginning in 1993 and continuing through 1996. Each of these attempts by the Government's attorney to avoid decisions by the Board on the merits of the Kwajalein claims were ultimately rejected by decisions rendered by the ASBCA, but plaintiff was required to expend significant efforts and time in opposing the positions and arguments of Government counsel. In addition to such formal pre-trial proceedings before the Board, plaintiff's attorneys also devoted long hours and effort in the conduct of documentary discovery in the Honolulu offices of the Army Corps of Engineers, and in responding to discovery requests by the Government's trial counsel.

18.     Under date of February 5, 1997, Government counsel filed a motion requesting the production of all documents affecting any assignment of the Kwajalein contracts by defendant, HII, to HIE, and shortly thereafter Government counsel filed a motion with the ASBCA to dismiss all of the pending Kwajalein contracts appeals on the grounds that defendant, HII, had illegally assigned the Kwajalein contracts to HIE without the knowledge or consent of the Government.

19.     Following the appointment of defendant, Raymond J. Harbert, as President of HII in July 1990, a decision was made by the board of directors of HII to reduce the company's participation in the construction business and to gradually sell off its construction business. It was ultimately agreed that defendant, Bill Harbert, would purchase HII's international construction business by acquiring HII's interest in HIE, An agreement affecting such sale was executed on December 9, 1991; under the terms of which it was agreed, *inter alia*, that any and all recoveries from pending

or future claims, including any under the Kwajalein contracts, would be for HIE's sole benefit

and account, and that HII would have no interest or claim therein.  Since the Kwajalein contracts

had been awarded to defendant, HII, it was the further understanding of the parties to the

agreement of December 9, 1991 that HII would provide assistance necessary for defendant, Bill

Harbert, to maintain and prosecute any such claims and appeals arising out of those contracts to

final resolution in the name of defendant, HII; but at the sole expense of defendant, Bill Harbert.

Following the creation of defendant, HIE, in 1975, a decision was made by the Board of

Directors of defendant, HII, in September 1981 authorizing enumerated officers of HII, including

defendant, Bill Harbert, to execute documents of assignment on behalf of HII, assigning overseas

construction contracts it had been awarded and/or the proceeds therefrom to HIE.  Essentially,

performance of all overseas construction contracts awarded to defendant, HII, after September

1981 were assigned to HIE pursuant to this decision of the Board of Directors of HII.

20.     Plaintiff was unaware of the September 1981 decision of HII's Board of Directors

referred to above in Par. 19, or of the agreement executed by defendants, HII and Bill Harbert on

December 9, 1991, or of the respective provisions of the same.   Nor was plaintiff aware or

advised by any representative of defendants, or otherwise informed that any assignments by

defendant, HII, may have been made to HIE of the Kwajalein contracts, prior to the demand by

counsel for the Government in Honolulu in February 1997 for the production of any such

assignment documents.

21.     In the course of plaintiff's investigation of the "assignment of contracts" issue, it was

discovered that defendant, HII, had advised the Government's representatives in Honolulu of its

desire to assign performance of the work under the Kwajalein contracts to HIE, and had obtained

the consent of the Government's Contracting Officer to do so; on the provision that HII would

remain contractually and financially obligated under those contracts to the Government.  Under

the circumstances, plaintiff believed that the contentions of the Government's trial attorney in

Honolulu that HII had illegally assigned the Kwajalein contracts were without foundation, that

the Government's efforts to obtain dismissal of the appeals pending before the ASBCA would

fail, and so advised defendant, Bill Harbert and the Board.  Therefore, plaintiff sought an early

hearing before the Board to resolve the "assignment of contracts" issue, since a ruling

unfavorable to the appellant by that Board on that issue might result in the dismissal of all of the

appeals.   Government counsel in Honolulu sought to further delay any hearing before the Board

to resolve the "assignment of contracts" issue or any other issue presented by the pending

appeals; filing instead further requests for discovery.


## The Suspension of the Appeals

22.    In response to plaintiff's request for an early hearing on the "assignment of contracts"

issue, the ASBCA on September 26, 1997, advised the parties that it agreed with plaintiff, and

intended to proceed first with an evidentiary hearing on that issue; followed by proceedings to

dispose of the "interest appeals," and finally disposition of the "global impact" claim.  On

December 8, 1997, the Board issued a further order confirming the order and procedure under

which it intended to proceed.  Shortly thereafter, the United States Department of Justice, by

letter dated  February 23, 1998 requested that the ASBCA stay or suspend all proceedings with

respect to the  appeals relating to the Kwajalein contracts.   The Government's attorney in

Honolulu filed a motion on March 9, 1998 requesting a stay of proceedings before the Board or outright dismissal of the appeals, based on the request of the Department of Justice.

23.    The interest of the Department of Justice in the matter arose out of an investigation it was conducting of several companies, including defendants, HII and HIE, and others, in respect to contracts, unrelated to the Kwajalein contracts, that had been funded by the United States Agency for International Development and the United States Corps of Engineers, agencies with their headquarters located in Washington, D.C.. Defendant, HII, retained the law firm of Spriggs & Hollingsworth, hereinafter "Spriggs," located in Washington, D.C. to represent it with respect to the Department of Justice's investigation. Commencing in March 1998, and, thereafter, plaintiff cooperated with Spriggs, and kept Spriggs advised of developments in the proceedings on the Kwajalein appeals before the ASBCA, including providing Spriggs with copies of all documents filed in the appeals by either the Government or plaintiff on behalf of defendant, HII, and other documents Spriggs considered pertinent to Spriggs' defense of HII. Defendant, HII, agreed to a 150 day suspension of the appeals pending before the Board and by order dated March 17, 1998, the Board granted a stay in its proceedings until August 26, 1998. Under date of August 4, 1998, the Department of Justice requested a further stay by the Board of its proceedings on the Kwajalein appeals of unstated duration. In response, the Board proposed dismissing the appeals without prejudice to their reinstatement by either party within three years. Plaintiff drafted a response opposing such further delay; but counsel to the defendants in connection with the Department of Justice investigation instructed plaintiff to merely propose that such additional stay be limited to an additional six months to February 25, 1999. On September 28, 1998 the

Board issued an order dismissing HII's appeals without prejudice; provided the appeals were reinstated on or before September 29, 2001.

### The Reinstatement of the Appeals

24.     In July 2001, several entities controlled by defendant, Bill Harbert, and Mr. E. Roy Anderson were indicted in United States District Court in Birmingham, Alabama for alleged violations of 15 U.S.C. §1 and 18 U.S.C. §371.  The alleged violations involved accusations of bid rigging and conspiracy to defraud the United States in connection with contracts funded by the Agency for International Development and the United States Army Corps of Engineers in Egypt.  None of the allegations in the indictment related to or concerned the award or performance of the Kwajalein contracts.  Trial of the charges was then scheduled for February 2002.  A separate *qui tam* action was brought against defendants, HII, HIE BHIC and others in the United States District Court for the District of Colombia in Washington, D.C..  This *qui tam* action is presently pending in the Court as Case No. 95CV-1231 (WBB/JMF).

25.     By letter dated August 20, 2001, approximately one month prior to the deadline for reinstatement of the appeals, plaintiff wrote to defendant, Bill Harbert, requesting authorization to proceed with reinstatement of the appeals.   No response was received from Mr. Harbert.  Accordingly, a further written notice was sent via telefacsimile and U.S. mail to Mr. Harbert under date of September 26, 2001, advising him that plaintiff was concerned with the possible inadvertent forfeiture of the appeals and that it would file an appropriate motion with the Board to request reinstatement of the appeals the next day, unless it received written instructions to the contrary.  Having received no instructions to the contrary, plaintiff filed such a motion on

September 28, 2001. The Board subsequently notified the parties that the appeals had been reinstated on the Board's docket.

26.     Under date of November 15, 2001, the ASBCA once again suspended all proceedings in the Kwajalein appeals, pending completion of the criminal trial in Birmingham, Alabama then scheduled for February 2002. The Board's order stated that it planned to schedule a hearing on the "assignment of contracts" issue within 90 days of the conclusion of the criminal trial, which ended on February 12, 2002. Upon reinstatement of HII's appeals, the Government's trial attorney had renewed his demand that defendant, HII, provide the Board with proof of plaintiff's authority to represent HII and specifically to have reinstated the appeals. Recognizing that this had become an issue that would have to be addressed, plaintiff in a memorandum, dated March 13, 2002 transmitted a draft letter to defendant, Raymond Harbert, that plaintiff proposed to send to the Board in response to a letter from the Government's trial attorney in Honolulu dated February 22, 2002. The draft letter specifically was to advise the Board that HII was the appellant in the Kwajalein appeals and that plaintiff had been acting as HII's attorneys with respect to those appeals since the initial appeals had been filed ten years earlier. In response, plaintiff received a letter dated March 14, 2002, from the Spriggs firm advising that Mr. Joel Piassick, who was unknown to plaintiff, had requested that all future communication with defendant, Raymond Harbert, be sent by plaintiff through the Spriggs firm. The letter from the Spriggs firm did not contend that HII was not properly the appellant in the appeals before the ASBCA, or that plaintiff was not authorized to represent HII in connection with the Kwajalein claims and appeals. From that point, defendant, HII, and the Spriggs firm contended that HII had no interest in the claims and appeals pending before the ASBCA and repeatedly hindered the

15

efforts of plaintiff to successfully prosecute the appeals.   This hindrance and interference was manifested in many forms, including demands that HIE and defendant, Bill Harbert, enter into onerous agreements, attempts to preclude plaintiff from any contact with the ASBCA without prior written approval from Mr. Piassick and other conditions of representation that if enforced would have made it a practical impossibility for plaintiff to have effectively represented HII before the Board.  Most egregiously, defendant, HII,  insisted that plaintiff make factual representations to the Board that in plaintiff's view would have resulted in the forfeiture of the appeals.

27.     On April 18, 2002 the ASBCA scheduled an evidentiary hearing on the "assignment of contracts" issue to begin on September 3, 2002.    The hearing was subsequently rescheduled at the request of the Government to commence on November 18, 2002.

28.     Under date of July 10, 2002 the ASBCA issued an order permitting the Government to take the depositions of Messrs. Bill L. Harbert, Billy L. Harbert, and Raymond J. Harbert and Mr. Lloyd Jones.  Plaintiff was able to meet with all these individuals for purposes of assisting them in preparation for their depositions, with the exception of defendant, Raymond Harbert. Plaintiff's attempts to meet with Raymond Harbert to assist him in preparing for his deposition by the Government's trial attorney were rejected.

29.     Defendant Raymond Harbert's deposition was taken by the Government on August 30, 2002.  During his deposition defendant, Raymond Harbert, stated under oath that defendant, HII, was obligated to cooperate with his uncle, defendant, Bill Harbert, and facilitate his efforts in the claim process on the Kwajalein contracts.

30.     Prior to the hearing before the Board on the assignment of contracts issue, at the demand of defendant, HII, a motion was prepared by plaintiff to substitute BIE for HII as the appellant in the appeals before the ASBCA, and, upon approval by defendant, HII, and the Spriggs firm was submitted to the Board.

31.     In addition to its insistence that a motion be made to substitute BIE for HII as the appellant in the appeals pending before the Board, defendant, HII, had further advised plaintiff that, in the event such substitution was not granted by the Board, its agreement to permit the appeals to proceed before the Board with HII as the appellant would be conditioned upon an audit by HII of the claims.  By letter dated October 11, 2002, plaintiff had advised the Spriggs firm that HII should begin such audit so as to assure that an unqualified ratification of the reinstatement of the appeals could be made by HII in the event the motion to substitute BIE was not allowed.  No response to plaintiff's letter of October 11, 2002 was ever received and no audit of the claims by defendant, HII, was ever undertaken.

32.     The hearing before the ASBCA on the assignment of contracts issue was held in the period from November 18, 2002 through November 20, 2002.  Defendant, Raymond Harbert was called as a witness by the Government.  In the course of his examination he was asked repeatedly by the Administrative Judge of the ASBCA if he ratified the reinstatement of HII's appeals in September 2001.  The significance of and the necessity for such ratification of the reinstatement of the appeals , as a condition to the continued prosecution of the appeals before the Board, and to the Board's ability to rule on the pending motion to substitute BIE for HII as the appellant, was explained to defendant, Raymond Harbert, by the Administrative Judge, and he was given the opportunity to consult with legal counsel before answering. Defendant, Raymond Harbert,

17

equivocated, refusing to ratify the reinstatement of the appeals, but also stating that defendant,
HII's position with respect to ratifying the reinstatement of the appeals was as set forth in a letter
dated November 14, 2002 from Mr. Piassick to plaintiff.  In his letter, Mr Piassick stated in
pertinent part: " . . . if it is necessary for HII to ratify the September 28, 2001 reinstatement of the
appeals in order for Bilhar to be substituted for HII as appellant, *HII is willing to provide such a
ratification and hereby does so*" [emphasis added].  The letter further set forth conditions under
which HII would be willing to remain in the appeal as the named appellant.  The Board
suspended its proceedings pending further advice from Mr. Harbert.  In his testimony before the
Board, defendant, Raymond Harbert, provided no explanation or justification for his refusal to
unconditionally ratify the reinstatement of the Kwajalein appeals.  Under date of December 20,
2002, the ASBCA issued an order requiring, HII to either unconditionally ratify the reinstatement
of the appeals, or show cause within 30 days of defendant, HII's, receipt of the order as to why its
appeals should not be dismissed with prejudice.  The ASBCA's show cause order was received
by plaintiff as counsel of record for defendant, HII, on December 27, 2002.  Accordingly, the
deadline for filing HII's response to the show cause order was January 26, 2003.  Defendant,
HII, made no effort to conduct an audit of the claims in the interim between the conclusion of the
November 2002 hearing and the Board's December 20, 2002 order.  However defendant, HII, did
continue to indicate via letters, facsimile messages and email of its various representatives,
prepared subsequent to the conclusion of the November 2002 hearing, that it might ratify the
reinstatement of the appeals.  However, no response to the Board's order of December 20, 2002
was ever submitted by defendant, HII, with consequent forfeiture of all the Kwajalein claims and
appeals.

33.    Plaintiff continued to work on advancing the appeals after the conclusion of the November 2002 hearing.  Its work in this respect continued until the deadline for responding to the ASBCA's show cause order arrived.

34.    Plaintiff performed all that was required of it, or that reasonably could have been done to advance the Kwajalein claims to a successful resolution and favorable recovery on the amounts claimed.  Throughout, the entire twelve year period in which plaintiff was engaged in such efforts, it believed that defendant, HII, was the true party in interest, and that it had been engaged by and was representing defendant, HII, as the contracting party with the United States on the Kwajalein contracts.  Similarly, plaintiff reasonably believed that the individuals with whom it came in contact, and with whom it was working in the preparation and prosecution of the Kwajalein claims, who represented themselves to be officers and/or authorized representatives of defendant, HII were what they represented themselves to be and had the authority to act on behalf of defendant, HII.  Furthermore, defendants, HII and Raymond Harbert, knew or had reason to know that numerous individuals held themselves out to be officers and/or authorized representatives of HII, and knew or should have known that plaintiff was relying on the apparent authority of those individuals to make binding commitments on behalf of HII in respect to plaintiff's services in connection with the Kwajalein claims and appeals.  Defendants, HII and Raymond Harbert, knew that plaintiff was actively engaged in the preparation and presentation of claims arising out of the Kwajalein contracts, and had been so engaged for a number of years subsequent to December 1991.  However, at no time, did HII, Raymond Harbert, or anyone else ever advise plaintiff that HII had no interest in such claims, or that it contended it had transferred or sold any such interest in the Kwajalein claims to HIE, or that HII it was not the party in

19

interest in the same. Similarly, prior to 1997, neither defendant, HII, nor defendant, Raymond Harbert, had ever informed plaintiff that HII had purportedly assigned the Kwajalein contracts to HIE, as well as all the other international construction contracts upon which HII had engaged the services of plaintiff to prepare and prosecute claims against the United States of America, or which would require payment by agencies of the United States of America. On the contrary, as stated in Par. 16, above, defendants, HII and Raymond Harbert, represented to plaintiff and the contracting officer of the United States of America that HII was the contractor with respect to the Kwajalein claims and that it was the party entitled to payment on these claims by their execution and submission and certification of the claim of January 28, 1994. The forfeiture of the claims effectively acted to discharge plaintiff from its agreement to provide legal services in connection with the prosecution of the appeals. Plaintiff substantially performed its obligations and is entitled to payment in accordance with the fee agreement for its services. At the time, defendants, HII and/or Raymond Harbert, effectively decided to forfeit the Kwajalein claims, plaintiff's services were to be paid on the basis of a reduced hourly fee of $150.00, plus a contingency or success fee of 20% of the first $2,000,000 recovered and 25% of all amounts recovered in excess of $2,000,000; with all amounts paid for services at the hourly rate to be deducted from any amount due on the contingency or success fee. The total value of the Kwajalein claims/appeals, including interest thereon, which were forfeited as a consequence of defendants' failure to ratify the reinstatement of the appeals, and to permit plaintiff to prosecute the same to a conclusion before the ASBCA was $20,116,762.56, and plaintiff is entitled to payment under the contingency fee agreement on said sum in the amount of $4,779,830.20, which amount includes deductions for amounts previously paid by defendants to plaintiff for the

reduced hourly rates plaintiff billed previously under the contingent fee agreement.  The fee

agreement was signed by defendant, Bill Harbert, purportedly on behalf of defendants, HII and

BHIC.  Subsequently in a letter dated June 18, 2002, defendant, Bill Harbert, additionally

promised that he personally would honor the commitments he had made on behalf of HII to pay

for plaintiff's legal services.

35.     By letter dated April 11, 2003, plaintiff made demand upon defendant, Bill Harbert, for

payment of such fee in the amount of $4,779,830.20.  No payment of the same has been made to

plaintiff.

36.     Under cover of letter dated January 14, 2005, plaintiff made demand upon defendant, HII

for payment of such contingency fee in the amount of $4,779,830.20.  No payment has been

made.

37.     At all times, from the beginning of plaintiff's retention by defendant, Bill Harbert, in

1990 through early 2002, defendant, Bill Harbert had authority, either actual or apparent to act on

behalf of defendant, HII.  Alternatively, after the separation of their respective interests in 1991,

defendant, Bill Harbert, acted on behalf of himself as an individual and/or BIE and BHIC with

respect to plaintiff.

38.     By failing to make payment to plaintiff, defendant, HII, has breached the fee agreement

with plaintiff entered into by defendant, Bill Harbert on its behalf.

39.     By failing to make payment to plaintiff, defendants, Bill Harbert, and BHIC, have

breached the fee agreement with plaintiff.

40.     Should it be determined that defendant, Bill Harbert, had no authority to enter into a fee

agreement with plaintiff on behalf of HII, and that BIE and/or Bill Harbert  was the actual

beneficiary of plaintiff's efforts to obtain recovery on behalf of HII, then defendants, BIE and

Bill Harbert, will have received the benefit of plaintiff's legal services from 1995 to January

2003, for which Bill Harbert and BIE knew or should have known plaintiff had not been

adequately compensated.  Defendants, Bill Harbert and/or BIE will have been unjustly enriched

by those efforts and should be required to compensate plaintiff pursuant to the fee agreement, as

amended, executed by defendant, Bill Harbert in the names of HII and BHIC.

41.    By failing to make payment, defendants, BIE and Bill Harbert, have breached an implied-

in-fact contract with plaintiff and should be required to compensate plaintiff pursuant to the fee

agreement, as amended, executed by defendant, Bill Harbert in the names of HII and BHIC.

42.    Defendants, Raymond Harbert and HII, tortiously interfered with plaintiff's efforts to

effectively pursue the Kwajalein claims, and by failing to ratify the reinstatement of the appeals

have wrongly prevented plaintiff from achieving recovery on those claims on behalf of

defendants, Bill Harbert and/or BIE, and thus deprived plaintiff of the contingent fee called for

under the agreement executed by Bill Harbert.

43.    The individual defendants frequently disregarded the formalities associated with

conducting business in a corporate format when it benefitted their interests or otherwise suited

them, inducing others, including plaintiff to perform or act in reliance thereon to their detriment.

Accordingly, the corporate veils of the corporate entities should be pierced in each instance that

judgement in favor of plaintiff may be granted against the corporate entity defendants, and

judgement in favor of plaintiff against the individual defendants who own or control the

corporate defendant found liable should also be granted.

**Relief Requested**

44.    Based upon the foregoing, plaintiff respectfully requests that judgement be entered in its

behalf in the amount of  $4,779,830.20, plus interest thereon allowed by law, costs and/or such

other relief as this Honorable Court determines may be due.

**Jury Demand**

Plaintiff, respectfully requests that any trial of this action be conducted before a jury.

WHEREFORE, plaintiff respectfully requests that judgment be entered against

defendants as set forth herein.

Respectfully submitted,

King & King, Chartered

By:_____/s/_____
Christopher M. McNulty

D.C. Bar No. 362550

King & King, Chartered
c/o 3033 N. Dickerson St.
Arlington, Virginia 22207
Tel: (703) 237-4576