IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KING & KING, CHARTERED, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HARBERT INTERNATIONAL, INC., )<br>*et al.*, )<br>)<br>Defendants. ) | Civil Action No. 1:06-cv-00324 (JDB) |

**REPLY OF DEFENDANTS BILHAR INTERNATIONAL ESTABLISHMENT, BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., AND BILL L. HARBERT TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Defendants Bilhar International Establishment ("BIE"), Bill Harbert International Construction, Inc. ("BHIC") and Bill L. Harbert ("Bill Harbert"), by and through counsel, hereby submit their reply to the opposition ("Opposition") of Plaintiff King & King, Chartered ("King & King") to Defendants' Motion to Dismiss First Amended Complaint ("Motion") for failure to state a claim upon which relief can be granted.

## I.  PLAINTIFF IS NOT LEGALLY ENTITLED TO A CONTINGENT FEE WHEN THERE WAS NO RECOVERY BY DEFENDANTS

Plaintiff is seeking to recover a contingent fee based on an amount sought, but unliquidated, in appeals before the Armed Services Board of Contract Appeals that were dismissed before trial and therefore on which no recovery was made.

Plaintiff bases its recovery on Defendants' alleged breach of the fee agreement, which not even Plaintiff has alleged allows it to recover absent award to Defendant Harbert International, Inc. ("HII"). Absent express language allowing such recovery (and assuming the fee agreement does not state that there will be no fee without a recovery), Plaintiff must prove that the law

allows an attorney to recover a contingency even in the absence of recovery by the client, even if the client failed to prosecute its claims to decision.

The cases cited by Plaintiff (Opposition at 12, 1st para.) are inapplicable. All of them involve real estate or similar commissions in which, by analogy, there was the equivalent of "recovery" because the brokers obtained purchasers or lessees in accordance with their principals' requirements which the principals nonetheless refused to accept.

Plaintiff cites several cases for the proposition that District of Columbia law permits a discharged attorney to recover his or her full contingency if he/she has "substantially performed." (Opposition at 12, 2nd para.). Those cases are distinguishable from the instant case. In *Kaushiva v. Hutter,* 454 A.2d 1373 (D.C. 1983), attorney Hutter was discharged, after which the client recovered damages in an arbitration in which Hutter had represented the client. The court noted that its decision was consistent with decisions in other jurisdictions where an attorney was discharged without cause "and the client **subsequently recovers**." *Id.,* at 1375 (emphasis added). Here, of course, not only did Plaintiff not substantially perform (none of the appeals was prosecuted before the ASBCA), but there was also no recovery by any of the Defendants. The other case cited by Plaintiff, *Mackie v. Howland,* 3 App. D.C. (1894), is to the same effect as, and cited in, *Kaushiva.*

The District of Columbia Court of Appeals distinguished *Kaushiva* and *Mackie* in *In re Waller,* 524 A.2d 748, 750-51 (1987) stating:

> Waller would have us interpret "substantial performance" to mean only that the attorney has made the efforts which could be expected of him in the time before discharge, even if these efforts were negligible, and regardless of whether they benefited the client by contributing to the result finally obtained. Taking this view to its extreme, an attorney who entered into a contingency fee agreement, made a preliminary phone call for the client, then was discharged without cause immediately thereafter, would be entitled to his

full fee if a settlement later resulted. We recognize that there are jurisdictions which have taken this position. . . . However, guided by our precedent and principles of equity, as well the usual meaning of "substantial performance" in other areas of contract law, we are led to a different conclusion.

In *Kaushiva* [*v. Hutter*, 454 A.2d 1373 (D.C. 1983)], we held that "an attorney who enters into a contingency fee agreement with his client, substantially performs, and is then prevented by his client from completing performance is entitled to the full amount specified in the fee agreement. . . .

In *Kaushiva,* the attorney, engaged in connection with an arbitration matter, did, in fact, represent his client at three arbitration hearings before being discharged. In *Mackie v. Howland,* 3 App.D.C. 461 (1894), cited by us in *Kaushiva,* the attorneys had performed substantial services over several years in an attempt to collect amounts due on certain bonds, but were discharged shortly before payments were received, whereupon substitute counsel completed the transaction. In both of these cases then, the attorneys had performed extensive services in pursuit of the client's objective, services which contributed to the client's actual recovery. As the facts of these cases indicate, our use of the term "substantial performance" in *Kaushiva* in the context of contingency fee agreements between attorney and client, meant that the attorney must have performed valuable services contributing to the results finally obtained by the client. . . .

This interpretation accords with the meaning of "substantial performance" in other areas of contract law, where the use of the term presupposes not only that the promisor has substantially performed his part of the bargain, but that the promisee has received substantial benefits from the performance. "[T]he right to recover on such theory depends on whether or not the adverse party has received, to all intents and purposes, all the benefits which he could reasonably anticipate receiving under the contract."

As noted, Plaintiff has not claimed that it was not fully paid the fixed hourly fee it agreed to.

Having failed even to allege that the fee agreement provided for payment of the contingency portion of the fee regardless of whether there was any recovery in the ASBCA appeals (which, of course, would turn the contingency into a fixed fee), and having failed to present any statutory or common law in support of its assertion, Plaintiff has not stated a case for breach of contract by any of the Defendants, as a result of which its claims must be dismissed for failure to state a claim upon which relief can be granted.

Plaintiff also asserts that HII's alleged agreement to cooperate with Bill Harbert in the

"claim process" on the Kwajalein contracts raises the reasonable "inference" that this cooperation included an obligation to ratify reinstatement of the ASBCA appeals. (Opposition at 11.) This "inference" ignores Plaintiff's contentions in the Amended Complaint that Bill Harbert bought HII's interest in HIE, that all recoveries in the ASBCA appeals or future claims "would be for HIE's sole benefit and account", that "HII would have no interest or claim therein", and that Bill Harbert – not HII – had the right and authority to maintain and prosecute the claims and appeals. (Amended Complaint at ¶ 19.) Thus, Plaintiff has clearly recognized that HII had no independent obligation to ratify reinstatement of the appeals.

Notably, Plaintiff has failed completely to address Defendants' argument that Plaintiff's damages are too speculative to be awarded even if the Court finds its claims to be meritorious, since there was no recovery by Defendants to which the contingency could be applied. *See* Motion at 11-12.

Defendants also adopt the argument of Defendants HII and Raymond J. Harbert, entitled **Plaintiff's Claim is Unprecedented**, set forth at pages 3 – 4 of the Reply of Defendants Harbert International Incorporated and Raymond Harbert in Support of Motion to Dismiss.

## II.  PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

In response to Defendants' arguments that Plaintiff's claims are untimely, Plaintiff contends, *inter alia,* that Defendants have "mischaracterized" its claims and that the breach arose when Defendants failed to pay the contingency portion of the fee. (Opposition at 4-5.) This is nothing more than a desperate attempt by Plaintiff to avoid the inevitable consequence of the relevant facts, *i.e.,* that Plaintiff failed to bring its action within three (3) years after it accrued.

Defendants agree that the Complaint must establish, on its fact, that all or some of the

claims are time-barred in order for dismissal to be proper. Such was the case in *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1115-16 (U.S.App.D.C. 1985) where the court stated:

> The critical paragraph of Doe's complaint reads, in relevant part:
>
>> [U]pon her removal from her position with the Department, the officials who are named defendants here allowed, permitted, aided and abbetted [sic] in the spreading of the charges and the allegations by other officials of the Department of Justice amongst members of the bar in western states (and other lawyers and non-lawyers in western states and elsewhere) who deal with water rights.... This made it and continues to make it impossible for plaintiff to obtain other employement [sic] because it destroyed her reputation as a competent and capable attorney and as a sober and serious person.
>
> Plaintiff's Complaint ¶ 28, J.A. at 12. Applying the standard noted above to the pertinent part of the complaint, we find that we are in agreement with the District Court's conclusion that the complaint, on its face, shows these claims to be time-barred. The language "upon her removal" unambiguously indicates that the alleged publication(s) occurred at the time of Doe's discharge. Thus, since the one year statute of limitations applies and since Doe did not file suit until almost two years after the alleged publication(s), it is clear from the face of the complaint that the statute of limitations bars these claims.

Defendants' Motion details the fact upon which this Court can only reasonably conclude that their breach, if any, occurred prior to January 20, 2003. *See* Motion at 1 – 7. In fact, the facts pled by Plaintiff in its First Amended Complaint ("Amended Complaint") bring this case squarely within *Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc.,* 402 F.Supp. 198 (D.C. 2005). In that case, the Washington Metropolitan Area Transit Authority ("WMATA") entered into a lease of property with Quik Serve Foods, Inc. ("Quik Serve") which gave Quik Serve an option to buy the property on certain specified terms. In March 2000, Quik Serve wrote to WMATA stating that it was in the critical stages of negotiating with a third party as to a proposed development of the property and requested amending the lease to extend the due diligence period by 120 days and extend the purchase option for an additional two year period.

In April 2000, Quik Serve timely exercised its option but did not send the purchase price with its exercise or thereafter tender it.

After exercising its option, Quik Serve met with WMATA, which neither discussed the option exercise in the meeting nor addressed it in a May 2000 letter responding to Quik Serve's requested lease amendments. Quik Serve thought WMATA was trying to block Quik Serve's joint venture with the third party. Quik Serve's efforts to schedule another meeting with WMATA were unsuccessful, which led Quik Serve to believe that WMATA, in its self interest, intentionally delayed the purchase, which delay stalled the project's financing and negotiations with the third party.

The original lease required that Quik Serve build a restaurant on the property. In May 2003, when the restaurant was still not built, WMATA served Quik Serve with a notice of default and then a notice of termination. On April 27, 2004, Quik Serve filed suit against WMATA in the Superior Court of the District of Columbia for, *inter alia,* breach of contract, specifically, the option to purchase and seek damages and specific performance (Counts I & II). In May 2004 WMATA filed a landlord/ tenant action for possession of the property. Quik Serve removed the case to the U.S. District Court for the District of Columbia to consolidate the cases.

WMATA sought summary judgment on Counts I and II on the ground that they were barred by the statute of limitations. In granting the motion, the court stated as follows:

> In a simple contract, implied or express, the accrual of the action is the breach of the contract. Under certain circumstances, the statute of limitations may be tolled where the "fact of injury was not readily apparent and indeed might not become apparent until several years after the incident causing the injury had occurred." . . . Situations where the discovery exception tolls the statute of limitations include: fraud, medical malpractice, legal malpractice and fraudulent concealment. . . .
> 
> Contrary to Quik Serve's claims, the statute of limitations did not accrue at the time of

discovery. ***It was readily apparent to Quik Serve that WMATA had breached the contract through its action, or lack thereof, in response to Quik Serve's desire to exercise the option.*** There is little doubt that hindrance or prevention of performance is a breach of contract. . . . In April 2000, Quik Serve allegedly exercised the purchase option. . . . WMATA never responded to the alleged exercise of the purchase option despite repeated attempts by Quik Serve to raise the issue. Indeed, [Quik Serve] thought that WMATA was trying to block the joint venture. . . . By September 2000, [Quik Serve] believed that WMATA was intentionally delaying the purchase and in doing so frustrated Quik Serve's joint venture negotiation and its ability to obtain the necessary financing. . . .

WMATA's failure to respond to the alleged exercise of the option on numerous occasions, hinted at a breach of the contract. The passing of the deadline for exercising the purchase option should have further alerted Quik Serve that there was a potential breach of contract. Indeed, by September, 2000, [Quik Serve] thought that WMATA was trying to block the venture. [FN1.] At this point, Quik Serve either knew or should have known that WMATA had breached the contract. The breach occurred when WMATA substantially hindered the exercise of the purchase option, not when WMATA notified Quik Serve of its default and the termination of the contract. . . .

FN1. Furthermore, the breach may have occurred as early as May, 2000. In April 2000, Quik Serve attempted to exercise the purchase option. WMATA's reply letter, dated May 18, 2000, indicated a posture adverse to the terms of the contract because ***WMATA refused to acknowledge the change in the legal relationship between the parties***. Even if the existence of the breach was unclear at that point, it was certainly clear to Quik Serve by September, 2000. Therefore, to avoid the statute of limitations Quik Serve would have had to file the complaint by September, 2003.

Emphasis added.

Here, Plaintiff admitted – and its action depends on – facts which, in accordance with Washington *Metropolitan Area Transit Authority v. Quik Serve Foods, Inc.,* establish that its claims are barred by the statute of limitations. They include, but are not limited to:

- Bill Harbert's failure to respond to Plaintiff's August 20, 2001 request for authorization for Plaintiff to reinstate the appeals before the Armed Services Board of Contract Appeals ("ASBCA") (Amended Complaint at ¶ 25);
- Bill Harbert's failure to respond to Plaintiff's September 26, 2001 letter concerning reinstatement of the appeals or to authorize Plaintiff to do so (*Id.*);
- Plaintiff's acknowledged reinstatement of the ASBCA appeals on September 27, 2001 without any express authorization from HII (*Id.*);

- Raymond Harbert's failure to respond to Plaintiff's March 13, 2002 request that he certify to the ASBCA that Plaintiff was authorized to represent HII in the appeals and to have the appeals reinstated (*Id.*, at ¶ 26);
- the March 14, 2002 from the law firm of Spriggs & Hollingsworth ("Spriggs") advising Plaintiff that HII had no interest in the claims/appeals before the ASBCA (*Id.*);
- HII's efforts after March 14, 2002, as **alleged by Plaintiff,** to "hinder[] the efforts of plaintiff to successfully prosecute the appeals" (*Id.*; emphasis added);
- Plaintiff's assertion that "the hindrance and interference was manifested in many forms . . . Most egregiously, defendant, [sic] HII, [sic] insisted that plaintiff make factual representations to the Board [ASBCA] that in plaintiff's view would have resulted in the forfeiture of the appeals." (*Id.*);
- Rejection of Plaintiff's efforts, in or about July or August 2002, to meet with Raymond Harbert to prepare him for a deposition by the Government (*Id.* at ¶ 28);
- HII's failure to respond to Plaintiff's October 11, 2002 letter regarding an audit of the claims in the ASBCA appeals and its failure to conduct an audit (*Id.*, at ¶ 31); and
- Raymond Harbert's refusal to ratify reinstatement of the appeals during a November 2002 ASBCA hearing and his refusal to explain or justify why he would not do so (*Id.*, at ¶ 32).

These facts, set forth in Plaintiff's Complaint, conclusively establish that Defendants' actions that Plaintiff contends were breaches of the contract were or should have been "readily apparent" to Plaintiff long before January 20, 2003, particularly in light of Plaintiff's own assertions that Defendants hindered Plaintiff's efforts to successfully prosecute the appeals, all of which (except the failure to respond to the ASBCA's show cause order by January 26, 2003) occurred well before January 26, 2003.

Plaintiff contends that the Complaint does not support Defendants' assertion that Plaintiff knew that it had no authority to reinstate the appeals. (Opposition at 9.) This is belied by the Amended Complaint itself at, *e.g.*, ¶ 25. Plaintiff also asserts that paragraph 9 of the Amended Complaint is evidence that it had no knowledge that Bill Harbert did not have authority to represent HII. However, paragraph 9 does not even mention Bill Harbert.

## III. PLAINTIFF HAD FAILED TO ADEQUATELY STATE CLAIMS AGAINST BILL HARBERT PERSONALLY

The Amended Complaint alleges that by letter dated June 18, 2002, Bill Harbert agreed "that he personally would honor the commitment he had made on behalf of HII to pay for plaintiff's legal services." (Amended Complaint at ¶ 34.) As Defendants have noted, HII was liable for Plaintiff's hourly fees, for which Plaintiff is not claiming it was not already paid, and for a contingent fee based on *recovery* from the Government. Because Plaintiff has acknowledged that the ASBCA appeals were forfeited, no contingency payment is due.

## IV. THE COMPLAINT FAILS TO CONTAIN ANY FACTS IN SUPPORT OF PLAINTIFF'S BREACH OF CONTRACT CLAIMS AGAINST BHIC

In response to Defendants' argument that the Amended Complaint does not contain any facts supporting breach by BHIC, Plaintiff does not allege any contract between Plaintiff and BHIC or facts from which it can reasonable be inferred that such a contract existed. Rather, its breach of contract claim against BHIC is based on its assertion that if Plaintiff was not representing HII, then its services "were actually being performed for [Bill Harbert's] benefit, or the benefit of BHIC and/or BIE." (Opposition at 17.) Plaintiff also asserts that "Bill Harbert executed the fee agreement on behalf of BHIC," citing the Amended Complaint at ¶ 34. (*Id.*) This latter statement is completely contrary to the prior allegations in the Amended Complaint that Bill Harbert executed the fee agreement on behalf of HII (Amended Complaint at ¶ 34) and that "[a]t all times subsequent to the creation of HII in 1981, plaintiff reasonably believed that it had been *engaged by and was providing legal services to defendant, HII*, in respect to each of these international construction projects. None of the defendants, nor any other entity or individual [sic] *ever did or said anything* to plaintiff to counter plaintiff's belief in this regard

until the spring of 2002" and that "[w]ith its engagement *by defendant, HII*, in July 1990, plaintiff was actually involved on essentially a continuous basis, in providing legal advice and assistance *to HII*. . . ." (Amended Complaint at ¶¶ 9, 13; emphasis added.)

It is clear that Plaintiff's *breach of contract* claims against BHIC have been made solely in an attempt to get another party on the hook if it cannot recover from HII. In the absence of the facts required to state a *prima facie* case of breach of contract against BHIC, Plaintiff's breach of contract claims against BHIC must be dismissed.

## V. THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST BILL HARBERT OR BIE

In a last ditch effort, Plaintiff seeks damages from Bill Harbert and *BIE* – yet another separate entity - for unjust enrichment *if* the Court determines that Bill Harbert was not authorized to contract with Plaintiff on behalf of HII and *if* the Court determines that BIE was the actual beneficiary of Plaintiff's services. (Amended Complaint at ¶ 39.)

Plaintiff acknowledges that to prevail based on its implied-in-fact contract theory, it must show, *inter alia,* that the services were carried out under such circumstances as to give *Bill Harbert and BIE* reason to understand that they were performed for them and *not for some other person,* that they were not rendered gratuitously, but with the expectation of compensation *from Bill Harbert and BIE*, and that the services were beneficial *to Bill Harbert and BIE*. *Bloomgarden v. Coyer,* 479 F.2d 201, 156 U.S.App.D.C. 109, 116-17.

Plaintiff's claim for the contingency portion of the fee must be dismissed. There is no assertion that that Bill Harbert or BIE understood that Plaintiff was rendering services for them; rather, Plaintiff simply contends that Bill Harbert and BIE are liable if the Court finds that Bill Harbert lacked authority to enter into the fee agreement on behalf of HII (which none of

Defendants has ever claimed and despite the fact that Plaintiff was fully paid by HII for its hourly-rate services under the agreement) and that BIE and/or Bill Harbert was the "actual beneficiary of plaintiff's efforts to obtain recovery *on behalf of HII*. . . ." (Amended Complaint at ¶ 40.) Plaintiff does not even assert that, after the alleged assignment to HIE of HII's contracts with the Government, Plaintiff rendered its services to or for any person or entity other than HII.[1]

These claims must also be dismissed because, as Plaintiff admits, it is seeking payment of the contingency portion of the fee agreement. Because a contingency fee is dependent on recovery, and because there was no recovery on the ASBCA appeals, neither Bill Harbert nor BIE benefited from any services allegedly rendered by Plaintiff.

There is no factual assertion in the Amended Complaint that Bill Harbert was not authorized to enter into the fee agreement with Plaintiff. "The law is clear that a corporation is bound by the acts of its officers so long as they act with either actual or apparent authority." *Columbia Hospital for Women Foundation, Inc., v. The Bank Of Tokyo-Mitsubishi, Ltd.*, 15 F.Supp.2d 1, 7 (1997), *aff'd* 159 F.3d 636, 333 U.S.App.D.C. 46 (D.C.Cir. 1998). There is also no evidence or even allegation that BIE entered into a fee agreement with Plaintiff. Plaintiff has repeatedly stated as fact that *HII* hired Plaintiff. Furthermore, no reasonable person could find that BIE benefited from Plaintiff's actions, particularly since there was no recovery on the appeals before the ASBCA.

---

[1] Plaintiff does allege that it was directed to move to substitute BIE for HII as appellant after Plaintiff unilaterally – and without HII's consent or authority – moved to reinstate the appeals at the ASBCA. *See, e.g.,* Amended Complaint at ¶ 19 *et seq.* As noted, Raymond Harbert, President of HII, refused to ratify the reinstatement and the appeals were forfeited.

**CONCLUSION**

In consideration of Defendants' Motion and the foregoing, Defendants BIE, BHIC, and Bill Harbert respectfully pray that the Court dismiss Plaintiff's claims against them pursuant to Rule 12(b)(6).

>Respectfully Submitted
>
>BILHAR INTERNATIONAL ESTABLISHMENT,
>BILL HARBERT INTERNATIONAL
>  CONSTRUCTION, INC.,
>BILL L. HARBERT
>
>By:_____/s/_____
>    Laurence Schor (#11484)
>    Dennis C. Ehlers (#478721)
>    McManus, Schor, Asmar & Darden, LLP
>    1155 15th Street, N.W.
>    Suite 900
>    Washington, D.C. 20005
>    Telephone: (202) 296-9260
>    Facsimile: (202) 659-3732

April 20, 2006

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing were served electronically this 20th day of April 2006 on:

Christopher M. McNulty, Esq.
King & King, Chartered
3033 N. Dickerson St.
Arlington, Virginia 22207
*Counsel for Plaintiff*

and

Michael J. McManus, Esq.
Jeffrey J. Lopez, Esq.
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Suite 1100
Washington, D.C. 20005
*Counsel for Defendants Harbert International, Inc. and Raymond J. Harbert*

                                                /s/
                                      Dennis C. Ehlers