# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 10, 2007     Decided October 12, 2007

No. 06-7119

KING & KING, CHARTERED
APPELLANT

v.

HARBERT INTERNATIONAL, INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 06cv00324)

*Christopher M. McNulty* argued the cause and filed the briefs for the appellant.

*Michael J. McManus* argued the cause for the appellees. With him on the brief for appellees Harbert International, Inc., and Raymond J. Harbert were *Jeffrey J. Lopez* and *Justin O. Kay*.

*Laurence Schor* and *Dennis Ehlers* were on the brief for appellees Bilhar International Establishment, Bill Harbert International Construction, Inc., and Bill L. Harbert.

Before: HENDERSON, RANDOLPH, and BROWN, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Appellant King & King, Chartered, appeals from the district court's dismissal of a claim for *quantum meruit* and a claim of tortious interference with contractual relations. We affirm the district court's decision as to both claims.

I

King & King, Chartered, a law firm with offices in Washington, D.C., represented one or more of the appellees in a dispute with the United States over construction contracts. In confusing circumstances, the clients elected not to pursue the case, and King & King thus lost the chance to earn its contingent fee. Although the clients had already paid a deposit of $150 per billed hour, the firm demanded more, filing the instant action in Superior Court in the District of Columbia, asking for the full $4.8 million it would have earned for a complete recovery. Alternatively, the firm sought *quantum meruit* compensation for work performed. In addition, King & King sought damages for tortious interference, alleging two of the appellees caused the clients to withdraw the case. After removing the case to district court, appellees successfully moved to dismiss the entire complaint for failure to state a claim. *King & King, Chartered v. Harbert Int'l, Inc.*, 436 F. Supp. 2d 3 (D.D.C. 2006). King & King appeals the dismissal of the *quantum meruit* and tortious interference claims.

Appellees include Bill Harbert, his nephew Raymond Harbert, corporations they control, named Bill Harbert International Construction (BHIC) and Harbert International (HII) respectively, and a corporation of which each originally controlled 50%, named Bilhar International Establishment (Bilhar). Between 1987 and 1989, HII received fifteen contracts for construction work on Kwajalein Atoll related to the Strategic Defense Initiative. Appellant, who had provided legal services

3

to HII since the early 1980's, represented the corporation in various disputes with the U.S. Government over the performance of the Kwajalein contracts. Eventually, the disputes became so substantial that the appellees filed a claim at the Armed Services Board of Contract Appeals (ASBCA) requesting a $12.8 million adjustment to the contract price. King & King prepared this claim in 1992 and 1993 and filed the claim in 1994. King & King continued to prosecute the claim over the succeeding years.

At first, HII apparently paid the firm on an hourly basis, but in 1995 they agreed to a contingent fee. Under the agreement, King & King was to receive 20% of the first $2 million recovered in the case and 25% of any greater recovery. In the meantime, King & King was to bill $150 per hour, and these payments would be deducted from the eventual contingent recovery. According to the complaint, Bill Harbert signed the 1995 fee agreement on behalf of BHIC and HII. He controlled the former corporation, and he had been the President of the latter until 1990 and Vice Chairman until 1992. On June 18, 2002, Bill Harbert sent King & King a letter promising personally to pay debts owed by HII for the firm's services.

Meanwhile, Bill and Raymond Harbert had adjusted their business structures. In 1990 Raymond succeeded Bill as President of HII, and the two agreed to transfer HII's international construction business to Bilhar. On December 9, 1991, HII assigned all its pending and future claims under the Kwajalein contracts to Bilhar, while Bill Harbert bought HII's interest in Bilhar. King & King did not learn about the assignment until 1997, when HII revealed it in response to a government discovery request in the ASBCA case.

In 1998, the ASBCA suspended the proceedings, at the request of the Department of Justice, which had begun a criminal investigation into the Harberts' dealings. After the Department requested a further stay, the ASBCA finally

4

dismissed the proceedings on September 28, 1998. The dismissal was without prejudice as long as HII reinstated its claim before September 29, 2001. During the intervening three years, the criminal investigation focused on Bill Harbert's corporations, which the government accused of fraud and bid rigging in relation to some construction contracts in Egypt. These contracts had already given rise to a federal *qui tam* lawsuit, which the United States joined in February 2001. The government followed with a criminal indictment of Bill Harbert's corporations in July 2001.

As the 2001 deadline for refiling at the ASBCA approached, King & King tried to contact Bill Harbert. By September 28, he had not replied, but the firm refiled the case anyway. The ASBCA immediately suspended all proceedings until the criminal trial ended on February 12, 2002. When the ASBCA proceeding reconvened, the Government demanded proof that King & King had authority to refile the case. The firm drafted a letter of authorization for Raymond Harbert, the President of HII, to send to the ASBCA. He responded through his criminal attorney, demanding, among other things, that King & King move to substitute Bilhar for HII as the claimant at the ASBCA. In depositions and in filings at the ASBCA, Raymond Harbert refused either to disavow the proceeding or to ratify it unequivocally. Eventually, on December 20, 2002, the ASBCA issued a show cause order demanding that HII ratify the refiling. Since the company did not respond, the ASBCA dismissed the case with prejudice.

King & King complains that appellees' effective abandonment of the ASBCA case spoiled the firm's chance to follow through on work already done and win the case. In addition, Raymond Harbert and HII, by not ratifying the refiling, interfered with the firm's representation of Bilhar, preventing recovery of the contingent fee.

5

II

This Court reviews the dismissal of a complaint *de novo*. *Am. Fed'n of Gov't Employees v. Rumsfeld*, 321 F.3d 139, 142 (D.C. Cir. 2003).

A

A client has the ultimate authority to control his affairs; thus, he may settle a claim, regardless of his attorney's efforts to prosecute it. *Barnes v. Quigley*, 49 A.2d 467, 468 (D.C. 1946). A client may also, in good faith, choose to withdraw a claim despite having expressly promised his attorney otherwise. *Id.* In addition, a client may discharge his attorney, with or without cause, and such a discharge will not constitute a breach of any agreement between them. *Skeens v. Miller*, 628 A.2d 185, 187 (Md. 1993).

This rule is admittedly harsh to attorneys, especially to those who provide services under contingent-fee agreements, for they bear a substantial risk. An attorney's fees under such an agreement depend not only on the merits of the case, but also on the client's continued zeal for the cause and his willingness to continue retaining the attorney.

The District of Columbia, like other jurisdictions, wants clients to "compensate attorneys reasonably," as a matter of "fundamental fairness." *Connelly v. Swick & Shapiro, P.C.*, 749 A.2d 1264, 1267-68 (D.C. 2000). Therefore, a contingent-fee attorney may seek reasonable compensation when his client terminates the representation without cause. *Universal Acupuncture Pain Servs. P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004) (unless a contingent-fee attorney was discharged for cause, he is entitled to reasonable compensation); *Skeens*, 628 A.2d at 188. If the attorney substantially performed his tasks before being terminated, he may receive the agreed proportion of the client's eventual recovery. *Kaushiva v. Hutter*, 454 A.2d 1373, 1375 (D.C.

6

1983). Even if he performed negligible services, of little actual benefit to the client, he is entitled to *quantum meruit* compensation. *In re Waller*, 524 A.2d 748, 750 (D.C. 1987).

Conversely, an attorney terminated for good cause cannot recover a contingent fee. *Greenberg v. Sher*, 567 A.2d 882, 884 (D.C. 1989). A similar rule should preclude *quantum meruit* compensation when the client chooses to discontinue a case because of his reasonable assessment that there is "no chance of recovery." *Universal Acupuncture*, 370 F.3d at 265 n.7. Otherwise, a contingent-fee client, convinced he had no chance of success, would have to continue his case just to avoid *quantum meruit* liability. Such a policy would encourage litigants to take unwarranted risks and prolong litigation simply to avoid paying attorney fees — a predicament that mocks the ideal of client control.

The facts here exemplify the dilemma. By 2002, appellees had disputed the Kwajalein contracts with the Government for eleven years without success, and their overall legal position had deteriorated disastrously. Their original claim for $12.8 million had grown, with the addition of interest, to $20.1 million, while the Government had continued to oppose them vigorously. In 2002, the Government was trying to get the appellees' claims dismissed on the ground that HII's 1991 assignment of the Kwajalein contracts to Bilhar was made without government consent and was therefore illegal. HII apparently doubted its ability to oppose dismissal, since during this phase of the ASBCA proceeding, it made factual representations that King & King asserts "would have resulted in the forfeiture of the appeals." [Compl. ¶ 26, JA 16][1] Meanwhile, Bill Harbert and his companies were busy

---

[1] Needless to say, a client's general authority to control his affairs includes the responsibility to represent the facts accurately.

7

defending civil and criminal fraud cases arising from the Egypt contracts.

Federal criminal indictments came in July 2001, and a criminal trial took place in February 2002. The civil case, a *qui tam* lawsuit, began in 1995, but the Government had just intervened in February 2001. In the middle of these fraud cases, in September 2001, King & King, of its own volition, filed to reinstate the ASBCA case. Given their situation, it would be eminently reasonable for the appellees to believe they had no chance to prevail at the ASBCA; to concentrate their efforts on defending the more dangerous fraud cases; and even to abandon the ASBCA case as part of a compromise with the Government. These are the kinds of difficult decisions a client must have the autonomy to make. The appellees tried to free their hands by putting the ASBCA case on a contingent-fee basis; in such extremely adverse circumstances, the law will not handcuff them by requiring *quantum meruit* compensation.

B

Appellant's claim for tortious interference with contractual relations fails because no third party who interfered with the contingent-fee agreement has been identified.[2] A person cannot be liable for interfering with his own contract. *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989).

---

[2] The district court ruled that appellant had no claim because a client's decision to terminate an attorney is not a breach of a contingent-fee agreement. 436 F. Supp. 2d at 16-17. We suspect that the District of Columbia would follow Maryland in allowing tortious interference claims when a third party induces a client to terminate an attorney. *See Sharrow v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 497-98 (Md. 1986).

8

King & King argues Raymond Harbert and HII were not parties to the contingent-fee contract. On this theory, when Raymond Harbert failed to ratify the reinstated ASBCA case, he interfered with the contingent-fee agreement Bill Harbert executed. However, the Complaint itself refutes this argument. King & King alleged Bill Harbert executed the agreement on behalf of "HII and BHIC," and that he later promised to honor "the commitments he had made on behalf of HII to pay for plaintiff's legal services." [Compl. ¶ 34, JA 20-21] The firm then demanded that HII pay $4.8 million as its contingent fee. [Compl. ¶ 36, JA 21] It alleged that by not paying, HII "breached the fee agreement . . . entered into by defendant, Bill Harbert on its behalf." [Compl. ¶ 38, JA 38] Although the firm also suggested, in the alternative, that Bill Harbert acted only on his own behalf, [Compl. ¶ 37, JA 21] this allegation is insufficient, because the tortious interference claim would be illogical. HII was the named party in the ASBCA case. If there was any contingent-fee agreement to interfere with, HII must have been a party to that agreement.[3]

As a party to the contingent-fee agreement, HII cannot have interfered with it. Therefore, King & King has no claim for tortious interference with contractual relations.

III

The district court's order dismissing King & King's complaint as to all claims is

*Affirmed.*

---

[3] Because Raymond Harbert acted in his capacity as President of HII, he cannot be liable for tortiously interfering with its contracts. *See Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988) (officers of a corporation cannot tortiously interfere with its contracts).